TRUE'S OIL COMPANY, *Respondent,* v. R. E. KEENEY *et al.,
Defendants,* CLARENCE F. DAVIS *et al., Appellants.\**

*Kenneth C. Hawkins,* for appellants.

*Gordon Blechschmidt* and *Velikanje, Moore & Countryman,* by *Morris G. Shore,* for respondent.

HAMILTON, J.—Respondent, True's Oil Company, brought this suit as a class action on behalf of itself and other creditors similarly situated, seeking to recover debts claimed due from the officers and directors of East Side Mint Distillers, Inc., a bankrupt corporation, hereafter re-

*Reported in 455 P.2d 954.

ferred to as East Side. Defendants R. E. Keeney and his wife, Mary, were both directors and served, respectively, as president and secretary-treasurer of East Side from its formation in December, 1960, until their resignation from all positions in the corporation in October, 1961. Defendant-appellant, Clarence Davis[1] was, at all times concerned, an East Side director and served as vice-president from the time of incorporation until he assumed the presidency upon R. E. Keeney's resignation.

Only respondent actively prosecuted its claim in the action. Evidence of the claims of other creditors was not fully adduced at the trial and their claims were dismissed.

The claim asserted by respondent arose out of transactions between it and East Side occurring during the period from June 30 to September 30, 1961. Respondent contended that the officers and directors during that period were personally liable on the corporate debt for two reasons: (1) because no affidavit of paid-in capital was properly filed before East Side commenced business as required by RCW 23.01.080;[2] and (2) because the circumstances involved justified piercing the corporate veil.

After trial to the court sitting without a jury, the trial court pierced the corporate veil as against the Keeneys but declined to do so as against appellant Davis. However, Davis, as well as the Keeneys, was held personally liable for failing to comply with the then prevailing portions of RCW 23.01.080, which read:

> (1) A corporation formed under this chapter shall not incur any debts or begin the transaction of any business, except such as is incidental to its organization or to the obtaining of subscriptions to or the payment for its shares, until:
>
> . . .
>
> (b) the amount of paid-in capital with which it will

---

[1] Mr. Davis' wife was joined as a party defendant, and the judgment runs against his marital community. For convenience we will refer to Mr. Davis as though he were the sole appellant.

[2] RCW 23.01.080 was repealed, effective July 1, 1967, with the enactment of the Washington Business Corporation Act, Laws of 1965, ch. 53, p. 1053.

begin business, as stated in the articles of incorporation, has been fully paid; and

(c) there has been filed in the office of the auditor of the county in which the corporation has its registered office an affidavit signed by at least a majority of the board of directors stating that the amount of paid-in capital with which it will commence business, as stated in the articles of incorporation, has been fully paid.

(2) If a corporation has transacted any business in violation of this section, the officers who participated therein and the directors, except those who dissented therefrom and caused their dissent to be filed at the time in the registered office of the corporation, or who, being absent, so filed their dissent upon learning of the action, shall be severally liable for the debts or liabilities of the corporation arising therefrom.

Findings of fact, conclusions of law and judgment were accordingly entered against the Keeneys and Davis severally for $6,664.14, the amount of respondent's claim. Only Davis appeals, the Keeneys having been declared bankrupts prior to trial.

The facts giving rise to the litigation and the result are these:

In late 1960 the Keeneys, then engaged in mint farming, and Davis, an electrical contractor, decided to enter into the business of distilling mint. They located a mint still which was for sale, and the Keeneys advanced a partial down payment of $500. Thereafter, they consulted an attorney for the purpose of incorporating their enterprise. Articles of incorporation were drawn and signed by the parties on December 6, 1960, and filed with the Secretary of State and the Auditor of Yakima County on December 8, 1960, and January 6, 1961, respectively. In the meantime, and by check dated December 9, 1960, Davis delivered to their attorney the sum of $4,000, from which the Keeneys were repaid the $500 they had advanced and $3,500 was applied on the down payment for the mint still, with the balance to be paid pursuant to the terms of a conditional sales contract. The evidence is in conflict and inconclusive as to whether Davis advanced the $4,000 as a loan or as a capital contribution to the corporation.

The articles of incorporation as drafted and executed by the parties designated Davis' Yakima County rural residence as the registered office and mailing address of East Side. The articles then made provision for an authorized capital stock of $50,000, divided into 500 shares of stock of a par value of $100 each. The articles further provided that East Side would commence business with $500 paid-in capital, the shares of the initial stock to be allocated one each to the Keeneys and three to Davis. It is undisputed, however, that no stock was ever issued and that no affidavit of paid-in capital was filed in Yakima County until March 9, 1962, the day East Side filed a voluntary petition in bankruptcy and long after it had commenced transacting the business giving rise to the debt claimed by respondent. In the meantime, and in accordance with the then prevailing RCW 23.01.180,[3] a document entitled Report and Statement

---

[3]"(1) Within thirty days after incorporation, and within ninety days after every subsequent allotment of shares the facts in regard to which have not been made public in a report previously filed as required by this section, the corporation shall file in the office of the auditor of the county in which the corporation has its registered office and in the office of the secretary of state, the fee to be one dollar in each of said offices for such filing, a report verified by the president or vice president and by the secretary, assistant secretary or treasurer, and containing:

"(a) A statement of the total number of shares allotted up to the date of the report, the number of such shares that have no par value, the number of such shares that have a par value, and the par value thereof;

"(b) an accurate, detailed and itemized description of the consideration received or to be received in payment for shares allotted, or allotted since the date of the last report;

"(c) a statement of the valuation put by the incorporators, shareholders or board of directors, as the case may be, upon the consideration other than cash received or to be received in payment for shares allotted, or allotted since the date of the last report, and, in case of shares allotted as a stock dividend, the amount of surplus transferred to capital in respect of such a dividend, whether all or any part of such surplus was created by a revaluation of assets, and if so, the value of the assets on the books of the corporation before and after such revaluation, the amount of the surplus or deficit before such revaluation, and the amount of the surplus after such revaluation." RCW 23.01.180.

as to Shares of East Side Mint Distillers, Inc., was filed with the Yakima County Auditor on January 12, 1961.

In the early part of 1961, the mint distillery which East Side had undertaken to purchase was moved onto Davis' rural residence property and situated on a concrete base some 500 to 600 yards from his home. Both Davis and the Keeneys participated in this preparatory operation, Davis utilizing his skills as an electrician to assist in making the distillery ready for operation. Thereafter, East Side commenced processing mint at the distillery around the first part of July, 1961, and continued through the 1961 mint harvesting season, which is normally about 90 days in length, until September 30, 1961. This was the one and only season East Side operated.

The Keeneys assumed managerial control of East Side during the 1961 operations, supervising the harvesting of the mint to be distilled and the daily operation of the distillery. Eighty per cent of the 50,000 pounds of mint processed by East Side during the 1961 season came from the Keeney farm. From the inception of East Side, and until October, 1961, no formal directors or stockholders meetings were held. No minutes or other written record of managerial or policy decisions were kept. All corporate receipts and disbursements were funneled through the Keeneys' personal checking account and no separate accounts or other financial records were maintained. No mint harvesting, distilling or mint oil brokerage agreements were formally made.

Davis, on the other hand, was aware of the operation in progress and assumed the responsibility of maintenance and repair of the distillery, inspecting it at least once each day and when necessary making or providing for such repairs as were required. Concerning his knowledge and his response to his obligations as a director and officer of East Side during this period, the trial court found as a fact (Finding of fact No. 15):

Defendant Davis was derelict in his capacity as a director of the corporation, having failed to see that the business was carried out in the proper manner or to take any

steps to correct the inadequacies. Defendant Davis, was aware that there were no corporate bank accounts established for the corporation, nor corporate minutes nor corporate account ledgers, nor written agreements between the corporation and any grower or broker for the purchase or sale of mint or mint oil. Defendant Davis was also aware and did nothing concerning the fact that Mr. Keeney was allowed to process his own mint, sell it at his own price or for whatever price he could obtain without any monies going through any corporate bank account or corporate accounts whatsoever, and that there were no assurances or agreements in favor of the corporation which provided that the corporation would receive the income from the sale, and hence provide a source of revenue from which debts, such as the one to plaintiff, could be paid. Defendant Davis also was aware that there were no Board of Directors' meetings held during the active operation of the business and made no effort to obtain such a meeting. He also knew that the bills were being incurred and took no steps to assure that the receipts from the sale of mint oil were placed in any corporate bank account or were applied to these debts.

In the process of conducting its 1961 operations, it was necessary for East Side to purchase fuel oil for the distillery and gasoline and other petroleum products for the equipment used to harvest and transport the mint to the still. To this end, the Keeneys contacted one R. H. Smith, a wholesale petroleum distributor and commission agent for respondent, who agreed to supply the required petroleum. Pursuant to this arrangement, and upon orders relayed through Smith, respondent supplied East Side with substantial quantities of gasoline, automotive oil, and light diesel fuel oil. The gasoline and automotive oil was drawn from bulk tanks situated at Smith's distributing plant, transported to East Side by Smith's trucks, and was invoiced through his office. The diesel fuel oil was supplied from bulk tanks located elsewhere, transported to the distillery by an independent trucking company, and invoiced out of respondent's main office in Spokane, Washington. Smith, however, was responsible, by virtue of his agency relationship with respondent, for the collection of accounts

within his territory. East Side made no payments for the products delivered and consumed.

Again, while the Keeneys were the actuating force behind the dealings with respondent and placed most of East Side's orders for petroleum, Davis was not passive. Davis knew that petroleum products were necessary to East Side's operation and that such products were being purchased on credit from respondent. All billings for the various deliveries were sent to his home, the registered office of East Side, opened by him and later turned over to the Keeneys. Davis was present several times when petroleum was delivered, accepted delivery on at least two occasions, and at least once placed an order when he noticed East Side's supply was low.

At the conclusion of the distilling operation in September, 1961, Davis manifested some overt concern relative to the financial situation of East Side. He sought the advice and assistance of an accountant and consulted with the attorney for the corporation. It was then learned that an affidavit of paid-in capital had not been executed or filed. In mid-October such a form was prepared in duplicate and signed by the directors of East Side on October 13 and/or 23, 1961. No filing of such an affidavit was then made, however.

A special meeting of the board of directors was called for October 28, 1961. At this meeting the Keeneys tendered their resignations as officers and directors of East Side, the resignations were accepted, two new directors were appointed,[4] and Davis became president. Proceedings were then authorized looking toward a possible resolution of the extant financial problems. Later, one of the affidavits of paid-in capital executed in October was filed in a county adjacent to Yakima County.

Efforts at rehabilitation of the corporate affairs proved fruitless, and on March 4, 1962, the board of directors authorized Davis to file a petition seeking an adjudication of bankruptcy on behalf of the corporation. At the same time,

---

[4]James Leiske and N. J. Camden, named as nominal defendants in this suit.

the board of directors authorized Davis, as president of the corporation, to make and execute a promissory note in the sum of $4,000 as evidence of the corporation's indebtedness to Davis for his initial advance on the distillery.

On March 9, 1962, one of the affidavits of paid-in capital executed in October, 1961, was filed in the Auditor's office of Yakima County, a petition seeking an adjudication of bankruptcy for the corporation was filed with the United States District Court, and a creditor's claim for the sum of $4,000, evidenced by a promissory note, was sworn to by Davis.

Listed as an unsecured obligation in the petition for a declaration of bankruptcy, which was sworn to by Davis, was respondent's claim in the sum of $6,664.14, characterized as "undisputed." Davis testified he arrived at this figure from copies of invoices then in his possession, and had no reason to question the accuracy of the amount claimed. Also listed was Davis' claim for $4,000, although he stated at trial that he had or intended to withdraw the claim. Davis likewise listed various other claims which he asserted the corporation owed him.

This action was initiated in the latter part of 1962 or the early part of 1963, and came on for trial first in October, 1964, and later in February, 1966, culminating in the judgment appealed from. On appeal, appellant Davis makes several assignments of error, which are interwoven into argument in such a way as to present three major contentions and some incidental minor contentions. We will discuss the major contentions in the following order: (1) That RCW 23.01.080 had been repealed and no longer governs this case; (2) that if RCW 23.01.080 governs, it does not apply under the facts of this case; and (3) that photocopies of respondent's invoices were improperly admitted into evidence. The minor contentions will be discussed, so far as merited, in connection with the major contentions to which they relate.

Appellant Davis, in contending that RCW 23.01.080 no longer governs this case, points to the fact that the 1965 legislature enacted a new Business Corporation Act (Laws

of 1965, ch. 53, p. 1053) designated as RCW 23A, which became effective July 1, 1967. That act repealed RCW 23.01.080. Because this is so, appellant urges that without a comparable substitute or a savings clause the repeal of a statute such as RCW 23.01.080, which arguably imposes a penalty, defeats all but final judgment thereunder and cites authorities in support of his assertion.

■ His argument, however, overlooks the fact that by Laws of 1967, ch. 190, § 10, p. 971 (RCW 23A.44.145), the legislature enacted and added a specific savings clause to the Business Corporation Act, which reads, *inter alia*:

The repeal of a prior act by chapter 53, Laws of 1965, shall not affect any right accrued, acquired or established, or any liability or penalty incurred, under the provisions of such act, prior to the repeal thereof.

Appellant has cited no authority which would indicate that, in the context of corporate law, such a savings clause would be ineffective or in contravention of any constitutional inhibition, and we have found none. We, accordingly, conclude that this contention is without merit.

Under his second major contention, appellant first argues that, despite the failure to timely file an affidavit of paid-in capital, there was a substantial compliance with the pertinent requirement. He asserts this to be so because he contends that (1) East Side constituted, under all of the circumstances, at least a de facto corporation; (2) more than $500 in cash or property of an equivalent value was paid in upon formation of the corporation; (3) the First Report and Statement as to Shares of East Side, filed with the Yakima County Auditor on January 12, 1961, contained a recitation of the allocation, issuance, and the cash value of the five shares of $100 par value stock, thus setting forth all information required of an affidavit of paid-in capital; and (4) respondent dealt with East Side as a corporation.

We cannot agree with appellant.

RCW 23.01.080 clearly and unambiguously imposed a duty upon the officers and directors of an infant corporation, and created a liability in the event of a breach of that

duty. In the instant case, there is no question but that the duty was breached.

We have no particular quarrel with appellant's assertion that East Side could, during the course of the transaction of the business involved, have been characterized as at least a de facto corporation and that the distillery acquired by the company could be considered as paid-in capital. It does not follow, however, upon the theory of substantial compliance that the statement as to shares, under the circumstances here revealed, can be characterized as a good faith substitute for the affidavit of paid-in capital required by RCW 23.01.080.

The statement as to shares recited that five shares of stock had been issued to the Keeneys and Davis, and that the consideration therefor was $500 cash. Concededly, this was false in that no shares of stock had been issued and those who signed the document knew that no such shares had been issued. The rationale of the doctrine of substantial compliance is that one who has made a good faith effort to comply with a technical requirement, noncompliance with which leaves him open to liability, should not be subject to that liability for a failure to literally comply. *Wheelock v. Haskell,* 98 Vt. 47, 124 A. 713 (1924). It cannot be said that filing a document which is false amounts to a good faith effort to comply.

Next, under his second major contention, appellant asserts that his corporate related activity did not amount to the "participation" required by RCW 23.01.080(2) before personal liability might be imposed for noncompliance with the statute. RCW 23.01.080(2) provides:

> If a corporation has transacted any business in violation of this section, the officers who participated therein and the directors, except those who dissented therefrom and caused their dissent to be filed at the time in the registered office of the corporation, or who, being absent, so filed their dissent upon learning of the action, shall be severally liable for the debts or liabilities of the corporation arising therefrom.

Appellant first urges that he was not a participating officer because the Keeneys, not him, made the arrange-

ments to purchase respondent's products, and, secondly, he contends that he was not a nondissenting director because there were no directors' meetings at which he could dissent since none were held.

These contentions are not well taken.

Appellant, as an officer, actively engaged in aiding the transaction of corporate business giving rise to respondent's extension of credit. He knew that before the distillery could be operated, mint had to be harvested and that both harvesting of the mint and operation of the distillery required the use of petroleum products. He knew petroleum products were being purchased on credit and he even ordered some. He knew that the distillery was in operation and he personally performed inspection, maintenance, and repair duties necessary to that operation.

■ In short, there is substantial evidence that appellant, as an officer, "participated" in the transaction of East Side's business, in the course of which the debt here involved arose. 19 Am. Jur. 2d *Corporations* § 1356 (1965); 19 C.J.S. *Corporations* § 894 (1940). This being so, we will not disturb the trial court's finding of fact to that effect. *Safeco Ins. Co. v. Dairyland Mut. Ins. Co.*, 74 Wn.2d 669, 446 P.2d 568 (1968); *Hatley v. West*, 74 Wn.2d 409, 445 P.2d 208 (1968).

■ Moreover, appellant, as a director, knew all there was to know concerning the debt involved, the circumstances giving rise to it, and that it was being incurred on credit. He never expressed an objection to the transaction of business in general, or to the incurring of this debt in particular. He suggests, however, that he could not be required to register a dissent because there were no formal directors' meetings. This is untenable. The statute provides for a method of dissent not dependent on presence at a directors' meeting—the filing of a dissent at the corporation's registered office. We cannot, without abrogating the statutory provision then in effect, hold that directors may avoid the statutory obligation simply by not holding meetings.

Finally, under his second major contention, appellant as-

serts that if he is liable, his liability should be limited to $500. He cites *Royer v. Maib,* 6 Wn.2d 286, 107 P.2d 335, 111 P.2d 593 (1940-41), and *Scharf v. Harstad,* 61 Wn.2d 188, 377 P.2d 416 (1963), for the proposition that the liability created by RCW 23.01.080 is a "limited liability."

The cited cases stand for no more than that the personal liability created by the statute does not necessarily extend to all debts arising from an unauthorized transaction of corporate business. They do hold, however, that the statute creates a liability for those debts which arise from and on account of the officers' or directors' dereliction or fault. *Royer v. Maib, supra.*

In the instant case, the trial court specifically found, upon substantial evidence, that appellant was derelict in his duty as a director and concluded that respondent's debt was incurred as a result of his dereliction. We find no reason in fact or law to disturb the trial court's determination in this respect.

By his third major contention, appellant challenges the admissibility of photographic copies of invoices reflecting the amount, prices and dates of petroleum products delivered to East Side by respondent. In this regard, he principally contends that respondent's commission agent, Smith, was not a qualified witness to lay the proper foundation for the admission of the invoices as business records under RCW 5.45.020.[5]

We do not reach the intricacies of appellant's argument in this regard, for the reason that an examination of the statement of facts reveals that appellant admitted (1) initially receiving the billing copies of the invoices; (2) utilizing copies of the invoices in the preparation of East Side's bankruptcy schedules; and (3) that the claimed amount was undisputed and accurate so far as he knew. Mr. Kee-

[5]"A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." RCW 5.45.020.

ney likewise conceded the correctness of the invoices insofar as they represented the quantity and value of the petroleum received. These admissions, coupled with the testimony of Mr. Smith that deliveries from his plant were invoiced through his office and that he was familiar with the methods and procedures pursued by respondent in invoicing deliveries from other plants at his order, gave rise to an appropriate foundation for receiving the documents into evidence. Under these circumstances we find no abuse of discretion on the part of the trial court in admitting the challenged invoices.

The judgment is affirmed.

HILL, FINLEY, and NEILL, JJ., and POYHONEN, J. Pro Tem., concur.